UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-80016-KAM

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JEFFREY SPIVACK,

    Defendant.
_____/

## PLEA AGREEMENT

The United States Attorney's Office for the Southern District of Florida ("this Office") and JEFFREY SPIVACK (hereinafter referred to as "Defendant") enter into the following agreement:

1. Defendant agrees to plead guilty to an Information charging him with various counts of Wire Fraud, in violation of Title 18, United States Code, Sections 1343 and one count of Extortion by Means of Interstate Communications, in violation of Title 18, United States Code, Section 875(b).

2. Defendant agrees that he shall waive Indictment and proceed via Information.

3. Defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). Defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the Court's probation

1

office, which investigation will commence after the guilty plea has been entered. Defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. Defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, Defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in paragraph 1 and that Defendant may not withdraw his plea solely as a result of the sentence imposed.

4. Defendant also understands and acknowledges that as to the Wire Fraud counts, the Court may impose a statutory maximum term of imprisonment of up to twenty (20) years, followed by a term of supervised release of up to three (3) years. As to the Extortion count, the Court may impose a statutory maximum term of imprisonment of up to twenty (20) years, followed by a term of supervised release of up to three (3) years. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000, or twice the gross gain or loss, whichever is greater. Defendant acknowledges that the Court may impose restitution.

5. Defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 4 of this agreement, a special assessment in the amount of $100 as to each count of conviction will be imposed on Defendant. Defendant agrees that any special assessment imposed shall be paid at the time of sentencing. If Defendant is financially

unable to pay the special assessment, Defendant agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for Defendant's failure to pay.

6. This Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning Defendant and Defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

7. This Office agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to Defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon Defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing Defendant's offense level is determined to be 16 or greater, this Office will file a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that Defendant has assisted authorities in the investigation or prosecution of Defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. This Office, however, will not be required to make this motion if Defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering into this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a

3

state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

    8.    The United States and Defendant agree that, although not binding on the probation office or the court, they will jointly recommend that the court make the following findings and conclusions as to the sentence to be imposed:

    a.    <u>Wire Fraud:</u>

    i.    <u>Loss:</u> The parties agree to recommend that the amount of money Defendant received from Victim-1 as a result of the Wire Fraud is $3,065,305.00. The parties agree to ask this Court to sentence Defendant according to a loss amount between $1.5 and $3.5 million for USSG §2B 1.1 purposes. However, the parties agree that the Court may order Defendant to pay Victim-1 a restitution amount greater than $3.5 million if Victim-1 suffers any tax or investment liabilities or expenses as a result of the Wire Fraud, which would cause the restitution to be higher than the 2B1.1 loss figure of $3,065,305.00.

    ii.    <u>Vulnerable Victim</u>: The parties agree that the defendant knew or should have known that a victim of the offense was a vulnerable victim under §3A1.1(b)(1), and that a 2 level enhancement <u>should apply</u>.

    iii.    <u>Abuse of Trust</u>: The parties agree that the defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense under §3B1.3, and that a 2 level enhancement <u>should apply</u>.

    iv.    <u>Financial Hardship:</u> The parties agree to recommend that the court <u>not apply</u> a two level enhancement under §2B1.1(b)(2)((A)(iii).

    v.    <u>Government Agent</u>: The parties agree to recommend that the Court <u>not apply</u> a two level enhancement under §2B1.1(b)(9)(A).



9.  Restitution:

Defendant agrees that the amount of restitution reflected in this agreement results from Defendant's fraudulent conduct.

a.  Pursuant to 18 U.S.C. §3663(a)(3), Defendant also agrees to make restitution to Victim-1 in the amount of at least $3,065,305.00, which is the loss suffered from a wire fraud offense against Victim-1 in years 2016 through 2020. This amount does not include additional losses suffered by Victim-1 in that Defendant's fraudulent actions caused Victim-1 to incur capital gains and other tax or investment obligations for the investment money prematurely withdrawn as a result of Defendant's fraudulent inducement.

10.  Defendant agrees, in an individual and any other capacity, to forfeit to the United States, voluntarily and immediately, any right, title, and interest to any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s), in violation of Title 18, United States Code, Section[s] 1343 and/or 875, to which Defendant is pleading guilty, pursuant to Title 18, United States Code, Section 981(a)(1)(C). In addition, Defendant agrees to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p). The property subject to forfeiture includes, but is not limited to:

> a.  a forfeiture money judgment in the sum of at least $3,065,305.00 in U.S. currency, which sum represents the value of the property subject to forfeiture; and
>
> b.  directly forfeitable, in part, and substitute property, including, but not limited to:
>
> > i.) 2019 Acura RDX with Vehicle Identification Number ("VIN") 5J8TCH70KL003558;

5

    ii.) 2019 Mercedes Benz CLS 450 COUPE with Vehicle Identification Number ("VIN") WDD2J5JB7KA010529; and

    iii.) Real property located at 560 N.E. 191st Street, Miami, Florida, 33179 more particularly described as:

> Lot 60, Block 36, of CHAMPION LAKES, according to the Plat thereof, as recorded in Plat Book 169, Page 71, of the Public Records of Miami-Dade County, Florida, together with a property interest in and to common elements.
> Parcel ID No.: 30-2206-060-3950

11. Defendant further agrees that forfeiture is independent of any assessment, fine, cost, restitution, or penalty that may be imposed by the Court. Defendant knowingly and voluntarily agrees to waive all constitutional, legal, and equitable defenses to the forfeiture, including excessive fines under the Eighth Amendment to the United States Constitution. In addition, Defendant agrees to waive: any applicable time limits for administrative or judicial forfeiture proceedings, the requirements of Fed. R. Crim. P. 32.2 and 43(a), and any appeal of the forfeiture.

12. Defendant also agrees to fully and truthfully disclose the existence, nature and location of all assets in which the defendant has or had any direct or indirect financial interest or control, and any assets involved in the offense[s] of conviction. Defendant agrees to take all steps requested by the United States for the recovery and forfeiture of all assets identified by the United States as subject to forfeiture. This includes, but is not limited to, the timely delivery upon request of all necessary and appropriate documentation to deliver good and marketable title, consenting to all orders of forfeiture, and not contesting or impeding in any way with any criminal, civil or administrative forfeiture proceeding concerning the forfeiture.

13. Defendant is aware that the sentence has not yet been determined by the Court. Defendant also is aware that any estimate of the probable sentencing range or sentence that Defendant may receive, whether that estimate comes from Defendant's attorney, this Office, or the probation office, is a prediction, not a promise, and is not binding on this Office, the probation office or the Court. Defendant understands further that any recommendation that this Office makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. Defendant understands and acknowledges, as previously acknowledged in paragraph 3 above, that Defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by Defendant, this Office, or a recommendation made jointly by Defendant and this Office.

14. Defendant agrees that any statements in this Agreement, and/or in the parties' Factual Agreement executed on __2/9/21__, shall be admissible against Defendant without any limitation in any civil or criminal proceeding. Defendant hereby waives any protection afforded by Rule 410 of the Federal Rules of Evidence and Rule 11(f) of the Federal Rules of Criminal Procedure with regard to any such statements and documentation. In the event that Defendant withdraws from this agreement prior to pleading guilty and/or fails to fully comply with any of the terms of this agreement, the United States will, at its option, be released from its obligations under this Agreement, but under no circumstances, shall the defendant be released from the agreements and waivers made by him in this paragraph.

### SENTENCING APPEAL WAIVER

15. The defendant is aware that Title 18, United States Code, Section 3742 and Title 28, United States Code, Section 1291 afford Defendant the right to appeal the sentence imposed in

this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, Defendant hereby waives all rights conferred by Sections 3742 and 1291 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or an upward variance from the advisory guideline range that the Court establishes at sentencing. Defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b) and Title 28, United States Code, Section 1291. However, if the United States appeals Defendant's sentence pursuant to Sections 3742(b) and 1291, Defendant shall be released from the above waiver of appellate rights. By signing this agreement, Defendant acknowledges that Defendant has discussed the appeal waiver set forth in this agreement with Defendant's attorney.

(Remainder of page intentionally left blank.)

16. This is the entire agreement and understanding between this Office and Defendant. There are no other agreements, promises, representations, or understandings.

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

Date: 3/8/21      By: _____
                       AURORA FAGAN
                       ASSISTANT U.S. ATTORNEY

Date: 2/12/2021        _____
                       VALENTIN RODRIGUEZ
                       ATTORNEY FOR DEFENDANT

Date: 2/09/2021        _____
                       JEFFREY SPIVACK
                       DEFENDANT

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 21-80016-KAM

UNITED STATES OF AMERICA )
)
v. )
)
JEFFREY SPIVACK, )
)
Defendant. )
)

## FACTUAL PROFFER

The parties agree that had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt to form the basis of convictions for Wire Fraud, in violation of Title 18, United States Code, Section 1343 and for Extortion by Interstate Communications, in violation of Title 18, United States Code, Section 875(b):

At all times relevant to the Information, Defendant JEFFREY SPIVACK was a licensed private investigator in Miami, Florida. Victim-1 hired Defendant in 2014 when she was looking for a private investigator to assist her with determining whether she was under surveillance by her ex-husband. Victim-1 actually hired another private investigative firm to assist her with locating her ex-husband's assets, which she believed he was hiding from her in the divorce litigation. Victim-1 also believed her ex-husband was monitoring her finances and eavesdropping on her, so that PI firm referred her to Defendant, who was purportedly adept as detecting surveillance techniques. Defendant wrote a report in 2014 detailing his findings that Victim-1 was not under surveillance.

1

In order to perform an analysis of whether the ex-husband was monitoring Victim-1's finances, Victim-1 gave Defendant access to her financial accounts. Thereafter, Victim-1 hired Defendant to assist her with her finances. In July 2016, Defendant caused a transfer of $500,000 from Victim-1's investment account to Defendant[1], allegedly to cover Defendant's expenses in locating the ex-husband's assets in a foreign country. However, Defendant did not travel to this foreign country, nor was he conducting an investigation into the ex-husband's assets.

Thereafter, Victim-1's health and mental acuity continued to decline, in part due to the series of strokes and brain cancer radiation treatments she had previously suffered. Defendant convinced Victim-1 that she could receive $200 million from the government as a whistleblower in a fraud investigation allegedly involving her ex-husband. To further perpetrate the fraud, Defendant "introduced" Victim-1 to a fictitious person named "Donna," who was allegedly an undercover agent who would be assisting Victim-1 in her whistleblower case. Throughout the scheme, Defendant was pretending to be "Donna" to perpetrate the fraud. From 2017 through 2020, Defendant caused Victim-1 to liquidate various investment accounts at T. Rowe Price and Fidelity and deposit the funds into her Bank of America accounts. Thereafter, Defendant caused a series of money transfers to be made from Victim-1's Bank of America accounts to Defendant's accounts at Wells Fargo and Bank of America. Defendant caused numerous wire transfers to be made from Victim-1's Bank of America account to Defendant's Wells Fargo account ending in #6066. Bank of America's servers are located outside the State of Florida. Defendant accessed Victim-1's Bank of America online account from his home in Miami-Dade County. At times,

---

[1] This money was sent via wire transfer on or about July 12, 2016 to Defendant's account at Bank of America which he opened in the name of Med Safety Corporation.

Defendant attempted to disguise the transfers as legitimate stock purchases by inserting terms like "series B, payment 1" into the memo section of the transfers. Victim-1 did not buy stock shares from Defendant or his companies.

In early June 2020, Victim-1's children were alerted that there was a significant amount of money missing from their mother's accounts. When confronted by her children, Victim-1 disclosed her belief that she was involved in a whistleblower investigation and was trying to collect her reward money. On or about June 13, 2020, Defendant, pretending to be "Donna" called Victim-1's cell phone using the Fake Caller app. Victim-1's children recorded the phone call Victim-1 had with "Donna". Although "Donna" presented herself as a government agent, her full name was never revealed to Victim-1, nor did Victim-1 ever meet with "Donna" in person.

On or about July 13, 2020, Victim-1 faxed a letter to Defendant. Thereafter, on July 17, Victim-1 received a text from a number that Victim-1 had not previously communicated with. In the text, Defendant told Victim-1, in part, "All communication should now be directed to this number. Text only, no voice calls possible. Will arrange phone call as soon as possible." In a second text, Defendant told Victim-1 "You should also avoid sending letters or anything else to Jeff's fax or email unless specifically requested. There's good news and bad news, which is very bad unless handled quickly, but you will understand everything after the telephone briefing. Be ready for phone call over the next few days. Until then do not discuss with anyone."

On July 23, 2020, while at her home in Palm Beach county, Victim-1 received a call from Defendant, acting as "Donna", which was recorded. Again, Defendant used the Fake Caller app to call Victim-1. Defendant/"Donna" referenced the recent fax Victim-1 sent to "Jeff". Defendant /"Donna" told Victim-1 that her boss was not happy because her boss found out what

"Donna" had been doing to help Victim-1. Defendant /"Donna" told Victim-1 that her boss wanted to "send a team to silence you and your family," and that the boss would make it look "like COVID." Defendant /"Donna" said that Jeff used to work for her boss. Defendant /"Donna" said that she and Jeff were able to convince the boss to give Victim-1 more time because Jeff agreed "to work on some operations for my boss", "off the books", "unsanctioned" and "very risky." Defendant /"Donna" repeated that this was the only thing that saved her (Victim-1) and her family and that Jeff agreed to do this and that he is taking an enormous risk. " Defendant /"Donna" also claimed that her ex-husband's divorce attorney was fabricating evidence to put Victim-1 and her daughter, Victim-2, at risk of federal criminal prosecution. Defendant /"Donna" warned "Your life and your freedom are at risk." Defendant /"Donna" claimed that she located some of the ex-husband's assets "overseas" and that her boss gave her six months "to get this wrapped up, or I'm gonna be 'retired'." Defendant /"Donna" explained that by retired, she did not mean she would get retirement gifts and a cake, but that "no one's ever gonna hear from me again." So she was "highly motivated to get this wrapped up in your favor."

Defendant /"Donna" went on to explain that the only way to get out of jeopardy was for Victim-1 to withdraw $350,000 from an investment account, keep $100,000 to pay her expenses and send "Donna" $250,000 of that money. Defendant /"Donna" pressed Victim-1 to have the investment company "FedEx you a check today." Defendant /"Donna" argued with Victim-1 about how much funds Victim-1 had remaining, and claimed that she knew Victim-1 had a large amount of money in that investment account.

On July 24th, Defendant /"Donna" texted Victim-1 from the Burner App$_2$, stating "Make

---

2 The Burner App allows one to use anonymous numbers to conduct communications.

4

sure you initiate withdrawal of $350,000 today and have them send it via FedEx. Do not let them stall you, and you don't have to explain. This is urgent to get what you need. Please acknowledge." In another text, Defendant /"Donna" insinuated that Jeff was almost injured in a "close call", and wrote, "The sooner this is all taken care of, the safer everyone will be."

On Monday, July 27th, Defendant /"Donna" texted Victim-1 from the Burner App, inquiring about the status of the $350,000 withdrawal. This time, Defendant /"Donna" told Victim-1 to have the investment company issue her two checks, one for $100,000 and another for $250,000. "Donna" wrote, "No matter what, they need to process the disbursements today and send to you by FedEx so you can deposit tomorrow." Defendant /"Donna" claimed that there was a "close call" over the weekend, but that "it was resolved without injury", insinuating that she and Jeff were risking their safety to help Victim-1. Defendant /"Donna" wrote, "Things are getting very dangerous, so it's urgent that this is all resolved ASAP."

On July 31, 2020, agents executed a search warrant at Defendant's residence in Miami. During the execution of the search warrant, agents found Defendant's Apple iPhone, which was found to contain the Burner App. Defendant utilized the Burner App to send the above described text messages between "Donna" and Victim-1. Defendant's iPhone also has an app for VPN[3] connections, and numerous banking apps, including those from Wells Fargo and Bank of America. The phone also contained the "Fake Caller" app, which enables a user to choose a voice changer feature and the ability to select a gender. Defendant utilized this Fake Caller app to disguise his

---

3 A VPN, or Virtual Private Network, connects a person's computer, smartphone or tablet to another server on the internet (a VPN server) and allows you to browse the internet or send communications using that server's internet connection. Therefore, a VPN user can achieve some anonymity online because by using the VPN server and it's IP address, the VPN user can hide his/her true location (or IP address.)

voice as the female "Donna" when calling Victim-1. Using Voice over Internet Protocol, or VoIP, Fake Caller routes users' calls through their servers outside the State of Florida.

Bank of America records confirm that Defendant's iPhone and home IP address in Miami-Dade county were used to conduct many of the online banking sessions moving money from Victim-1's accounts to the Defendant's bank accounts via wire transfers and intrabank transfers. In particular, Defendant accessed Victm-1's account via the Bank of America online banking feature from his home in Miami-Dade county to make the following wire transfers to his account at Wells Fargo ending in 6066:

$50,000 on May 26, 2017

$50,000 on February 9, 2018

$50,000 on July 15, 2019

$50,000 on February 24, 2020

Defendant used nearly all of the stolen funds for unauthorized purposes, to include personal expenditures, and gifts to family and friends. In particular, on or about February 22, 2018, Defendant used the funds stolen from Victim-1 to send a wire transfer to Andrew D. Tarr, P.A. Real Estate, in the amount of $88,196.41 for the down payment on the purchase of his residence located at 560 NE 191 Street, Miami, Florida 33179. On or about July 9, 2018, Defendant used the funds stolen from Victim-1 to purchase a cashier's check in the amount of $15,000, which he used as a down payment for the purchase of a 2019 Acura RDX, VIN 5J8TC1H70KL003558. On or about November 9, 2018, Defendant used the funds stolen from Victim-1 to pay off three American Express credit card transactions he made in the amounts of $10,000, $10,000, and $22,500 as a down payment for the purchase of a 2019 Mercedes CLS450C, VIN

WDD2J5JB7KA00529.

The total amount of money obtained from Victim-1 by means of fraud was approximately $3,063,775.00, which includes the amount of money transferred from Victim-1's accounts to Defendant's accounts, some of which were transferred via interstate transfers. The wire transfers list the recipient name of Jeff Spivack, Med Safety Corp., or Jeff Spivack/Med Safety Corp. The amount of loss suffered by Victim-1, which includes the amount stolen as well as wire transfer and bank fees, is approximately $3,065,305.00. However, this amount does not include any additional tax or investment liabilities or costs Victim-1 suffered as a result of liquidating investment funds at Defendant's direction.

Defendant's activity in the scheme to defraud and extortion plot described herein occurred in the Southern District of Florida, and elsewhere.

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: _____
AURORA FAGAN
ASSISTANT U.S. ATTORNEY


_____
JEFFREY SPIVACK
DEFENDANT

_____
VALENTIN RODRIGUEZ
ATTORNEY FOR DEFENDANT

---

4 Med Safety Corp. is a shell company registered in Wyoming which did not conduct any legitimate business. The company was created to receive money from Victim-1.